**ITRON, INC., Plaintiff,**

v.

**CELLNET DATA SYSTEMS, INC., Defendants.**

**Civil No. 4–96–972 (DSD/RLE).**

United States District Court,
D. Minnesota.

Jan. 28, 1999.

David A. Ranheim, Devan V. Padmana-
bhan, Niall A. MacLeod, Dorsey & Whitney,

Pillsbury Center, Minneapolis, MN, James H. Patterson, Sri K. Sankaran, Paul W. Stanga, Patterson & Keough, Minneapolis, MN, for plaintiff.

Michael R. Cunningham, Gray, Plant, Mooty, Mooty & Bennett, Minneapolis, MN, Keith V. Rockey, Thomas I. Ross, Dressler, Rockey, Milnamow & Katz, Chicago, IL, for Defendants.

## ORDER

DOTY, District Judge.

This matter is before the court on the parties' cross-motions for summary judgment. Based on a review of the file, record, and proceedings herein, and for the reasons stated, the court (1) grants CellNet's motion on the issue of non-infringement; (2) grants Itron's motion on the issue of the validity of Claim 36; and (3) denies each party's remaining motions.

## BACKGROUND

This case arises out of a dispute between plaintiff Itron, Inc. ("Itron") and defendant CellNet Data Systems, Inc. ("CellNet") over their competing electric meter-reading systems. Utility companies have long used electric meters to measure energy use by individual consumers. For decades, utilities read meters manually, hiring employees to walk from home to home reading the dials of each customer's utility meters. Relatively recently, technology has progressed to where the meters can be read electronically via wireless radio signal. Some early wireless systems used mobile receivers, placed in a truck or van, to drive through neighborhoods and read information transmitted from modules attached to the electric meters. Another system, designed by the DataBeam Company, used a fixed communication architecture to gather consumption information. In the DataBeam system, powerful 1000 milliwatt transmitters could send information to a receiver located at fixed sites. Each fixed receiver was designed to receive information from as many as 30,000 meters. In turn, the fixed receiver passed the energy consumption information to a central processing station. Although the DataBeam system represented a technological improvement over manual and mobile meter-reading systems, its large transmitting power and distance requirements compromised both its reliability and its cost-effectiveness.

Itron and CellNet each own next-generation fixed network meter-reading systems. Itron owns U.S. Patent No. 5,553,094 ("the '094 patent"), directed to a radio communication network for remote data generating stations. The '094 patent issued on September 3, 1996, issuing from Application Serial No. 271,545, which was filed on July 7, 1994 in the names of Dennis F. Johnson, Michael Wiebe and five other persons named as inventors. This patent was the continuation of a parent application first filed by Johnson and Wiebe alone as Application Serial No. 480,573 on February 15, 1990 and which issued as U.S. Patent No. 5,056,107 ("the '107 patent") on October 8, 1991.

The '094 patent describes a communication network characterized by four levels. The first level consists of meter modules attached to each consumer's electric meters. These meter modules are called "network service modules" ("NSMs"). The second level consists of receivers/transmitters located throughout the service area. These devices are called "remote cell nodes" ("RCNs"). The third level consists of intermediate receivers/transmitters, called "intermediate data terminals" ("IDTs"). The fourth level consists of the central computer at the utility's main billing office, which is called a "central data terminal" ("CDT"). Simply described, energy consumption information is passed up through the system in bundles of electronic data, from the NSM to the RCN to the IDT and, finally, to the CDT. Itron contends that this mulitiered, lower-power system architecture solves many of the problems inherent in prior fixed network schemes like the DataBeam system. The court will address the '094 patent in more detail below.

The CellNet system possesses a similar system architecture. Energy consumption information is delivered up through the system from what is called the "Transmit–Only Meter Module" ("TOMM") to the MicroCell Controller ("MCC"), then to the CellMaster and, finally, to the System Controller. CellNet contends that the system's technique for transmitting data sharply distinguishes it

from the '094 patent in two principle ways: First, rather than passing energy consumption information up the communications chain intact, as with the '094 patent, the CellNet system, at the MCC level, fragments the data bundle received from the meter module and recombines it into a new data bundle of energy consumption information. Second, rather than using redundant network paths for the transmission of energy consumption information, as with the '094 patent, the Cell-Net system designates one MCC as the single intermediate link between the meter-module level and later levels. The court will address the CellNet system in more detail below.

Late in 1996, Itron brought this action in federal court, complaining that the CellNet system infringes the '094 patent. After extensive discovery, Itron and CellNet now bring cross-motions for summary judgment on the issues of whether the CellNet system infringes the '094 patent and whether the '094 system is valid in light of the Data-Beam system and the earlier '107 patent.

### A. Standard for Summary Judgment

The court applies the same summary judgment standard to motions involving patent claims as it does to motions involving other claims. *See Avia Group Int'l, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1561 (Fed.Cir.1988). Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In order for the moving party to prevail, it must demonstrate to the court that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed. R.Civ.P. 56(c). A fact is material only when its resolution affects the outcome of the case. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *See id.* at 252, 106 S.Ct. 2505.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. *See id.* at 250, 106 S.Ct. 2505. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. *See Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. Moreover, if a plaintiff cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. *See id.* at 322–23, 106 S.Ct. 2548.

### B. Methodology for Claim Construction

■ The court's construction of disputed language in the '094 patent will play a pivotal role in the court's resolution of the infringement and validity cross-motions. The construction of patent claims is a matter of law exclusively within the province of the court. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). In interpreting an asserted claim, the court looks first to the intrinsic evidence of record, which includes: (1) the patent itself, including the claims, (2) the specification, and (3) the prosecution history. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir.1996). The intrinsic evidence is "the most significant source of the legally operative meaning of disputed claim language." *Id.*

■ Although words in a claim are generally given their ordinary and customary meaning, a patentee may choose to be his own lexicographer and use the terms in a manner other than their ordinary meaning, as long as the terms are defined in the patent specification or file history. *See id.* at 1582. A patentee may even use terms in a manner contrary to or inconsistent with their ordinary meanings. *See Hormone Research Foundation, Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1562 (Fed.Cir.1990). The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication. *See Vitronics*, 90 F.3d at 1582. Indeed, in most instances, the spec-

ification will be the "single best guide" to the meaning of terms in the claim. *Id.*

The specification, however, cannot be used to eliminate words or limitations found in the claims. *See Texas Instruments, Inc. v. United States Int'l Trade Comm'n,* 988 F.2d 1165, 1171 (Fed.Cir.1993). Nor can the specification be used to incorporate new limitations into a claim. *Intervet America, Inc. v. Kee–Vet Labs., Inc.,* 887 F.2d 1050, 1053 (Fed.Cir.1989). As the Federal Circuit has discussed:

> It is entirely proper to use the specification to interpret what the patentee meant by a word or a phrase in the claim. But this is not to be confused with adding an extraneous limitation appearing in the specification, which is improper. By "extraneous," we mean a limitation read into a claim from the specification wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim.

*E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.,* 849 F.2d 1430, 1433 (Fed.Cir. 1988) (citations omitted). Extrinsic evidence, such as expert testimony and dictionaries, may also be received, " 'to aid the court in coming to a correct conclusion' as to the 'true meaning of the language employed' in the patent." *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 980 (Fed.Cir.1995), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). However, excessive reliance on such evidence is inappropriate. *See Vitronics,* 90 F.3d at 1583 ("Allowing the public record to be altered or changed by extrinsic evidence would make the right [of the competitor to design around a claimed invention] meaningless").

**C. Parties' Cross–Motions for Summary Judgment on the Issue of Infringement**

Itron brings a motion for summary judgment, claiming that, as a matter of law, the CellNet system infringes Claim 36 of the '094 patent. CellNet also moves for summary judgment, claiming that, as a matter of law, the CellNet system does not infringe any claim in the '094 patent. An infringement analysis proceeds in two steps: First, the court must construe the claims alleged to be infringed. *See Markman v. Westview*

*Instruments, Inc.,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Second, the claims are compared to the allegedly infringing device. *See id.* A device may literally infringe every limitation of the asserted claim, *see Laitram Corp. v. Rexnord, Inc.,* 939 F.2d 1533, 1535 (Fed.Cir.1991), or it may infringe under the doctrine of equivalents if the differences between the claimed invention and the disputed device are not substantial, *see Warner–Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). If an independent claim is not infringed, a dependent claim containing all of the limitations of the independent claim cannot be infringed. *See Wahpeton Canvas Co. v. Frontier, Inc.,* 870 F.2d 1546, 1552 n. 9 (Fed.Cir.1989). In the present case, therefore, the court must determine whether the asserted independent claims in the '094 patent have been infringed by the CellNet system. In making this determination, three phrases in the patent will play critical roles. The court will construe each in turn.

**1. Claim Construction**

**a. "NSM-packet signal"**

Asserted independent claims 36, 39, 132, 140, and 146 describe the transmission of "the multiplicity of NSM-packet signals as an RCN-packet signal." A threshold question is how the term "NSM-packet signal" should be interpreted. Citing to the deposition testimony of plaintiff and defendant experts and a technical dictionary, Itron contends that "NSM" denotes only the source of the packet signal and does not alter what it claims is the common, ordinary sense of the term "packet signal": a discrete chunk of data.

However, the court cannot adopt this broad, generic interpretation of "NSM-packet signal." As CellNet points out, Itron's immediate reference to extrinsic evidence violates a basic rule of claim construction. In interpreting claim terms, a court must first examine evidence intrinsic to the patent. *See Vitronics,* 90 F.3d at 1582. This is especially critical where the disputed language involves a coined phrase like "NSM-packet signal." Reliance on extrinsic sources when interpret-

ing a coined phrase would run the risk of producing an arbitrary construction.[1]

Here, the intrinsic sources clearly demonstrate that "NSM-packet signal" does not mean, as Itron argues, any discrete amount of data transmitted from an NSM. First, Claim 36 makes separate mention of "NSM data" and "NSM-packet signal," showing that the patent intends a conceptual distinction between the two terms. Second, the specification clearly articulates the difference between "NSM data" and "NSM-packet signal":

> The NSM transmitter 318 transmits at a first carrier frequency the respective NSM data from the physical device in a brief message packet called an NSM-packet signal .... The NSM-packet signal transmitted by the NSM transmitter 318 follows a generic or fixed format; and a representative message packet is illustrated in FIG. 3. Included in the message is: preamble; opening frame; message type; message identification; service module type; message number; service module address; data field; error detection; and closing frame.

'094 Patent, Col. 8, ll. 2–13. Thus, as expressly defined by the specification, an "NSM packet-signal" includes more than just "NSM data"; it also includes a header, footer, and message identifier information.

While Itron argues that the specification describes a representative or preferred "NSM-packet signal" only, the language of the specification admits of little design flexibility, dictating a "fixed or generic format" made up of a number of information elements. The specification is "representative" merely in the sense that the exact combination of elements in the footer, header, and data structure illustrated in Figure 3 may vary. That is, although the precise structure may change, an "NSM packet-signal" must contain some kind of identifier information beyond the cumulative consumption data gathered by the NSM.[2] Viewed within the larger context of the patented system, this requirement makes perfect sense. Without receiving message identifier information, the RCNs would be incapable of deleting redundant NSM-packet signals, as required in many of the claims in the '094 patent. Equally important, without receiving message identifier information, the utility implementing the system would never know which customer is responsible for what energy consumption data.

In short, because the inventors have chosen to be their own lexicographers with regard to the term "NSM-packet signal," the court must adopt their definition.

### b. "Transmitting the multiplicity of NSM-packet signals as an RCN-packet signal"

Apart from their disagreement over the meaning of the term "NSM packet signal," the parties no longer seem to dispute the semantics of the claim language in which it is couched: "transmitting the multiplicity

---

1. Itron argues that "NSM-packet signal" has no special meaning within the context of the patent, and that, therefore, immediate reference to dictionary definitions and expert testimony is entirely appropriate. This is a surprising argument, especially considering Itron's later assertion, in resisting CellNet's motion for summary judgment on the issue of invalidity, that the term "network service module" is a term of art that can only be understood in light of the specification.

 However, even if the court were to agree that "NSM-packet signal" and "packet signal" are synonymous, CellNet has submitted ample extrinsic evidence that "packet signal" is commonly understood to have a definition more specific than what Itron claims it does. As one communications textbook explains, "The essential idea of packet switching is to encapsulate data messages into fixed length blocks. Addressing as well as other overhead information is added to

these blocks to form a packet." *See* Jeremiah F. Hayes, *Modeling and Analysis of Computer Communications Networks* 32 (1984) (CellNet Exh. Q). Further, at one point in his deposition, Itron's expert, Dr. Hulina, seemed to agree with this more specific definition: "The complete NSM-packet signal consists of a preamble, an opening frame, air detection, closing frame. Those are all digital, it's all digital data." Deposition of Dr. Paul T. Hulina, at 74 (CellNet Ex. E). In short, even if the court relies on extrinsic evidence, a substantial portion of it supports the construction the court draws from the patent's specification in the discussion below.

2. The court is well aware that extraneous limitations should not be imported from the specification into patent claims. Here, however, the court is not adding a limitation to the relevant claims but merely interpreting coined terminology that appears within it.

of NSM-packet signals as an RCN-packet signal." Certainly there is no suggestion in the patent that "an RCN-packet signal" is intended to have anything other than its ordinary singular connotation. *See North American Vaccine, Inc. v. American Cyanamid Co.*, 7 F.3d 1571, 1576 (Fed.Cir.1993). Accordingly, the court will construe the clause according to its plain meaning: the '094 patent requires that two or more NSM-packet signals be transmitted from the RCN as a single RCN-packet signal.

### c. "Within a range"

Each asserted independent claim except Claim 36 states that NSMs must be located "within a range" of at least two RCNs. *See* CellNet's Memorandum in Support of Its Motion for Non–Infringement at 22–24; Itron's Memorandum in Opposition to CellNet's Cross–Motion for Summary Judgment of Non–Infringement at 25. This limitation allows the '094 patent to achieve one of its central design goals, that of path redundancy. *See* '094 Patent, Col. 3, ll. 27–30 ("[An] object of the invention is a communications network for collecting data from network service modules that ... has inherent communication redundancy to enhance reliability and reduce operating costs."). The specification describes the important role redundancy plays in the patented system:

> The remote cell nodes 112 are arranged in an array with the spacing between the remote cell nodes 112 relative to the network service modules 110 so that each network service module can transmit to at least two and preferably four of the remote cell nodes 112. Thus, the remote cell nodes 112 are provided in significantly larger numbers than is absolutely necessary for each network service module 110 to be received by a respective one of the remote cell nodes 112. The remote cell nodes 110 theoretically receive high levels of duplicate information. In a normal residential situation, the location of the remote cell nodes 112 so that each network service module 110 can be received by four such remote cell nodes 112 would lead to an array in which each remote cell node 112 would be responsive to approximately 1,000 of the network service modules 110.

Col. 15, ll. 42–57. Itron contends that the phrase "within a range" does not require that an actual functioning communication link exist between an NSM and two or more RCNs. Rather, it argues, the patent requires only the possibility of such a link. As CellNet points out, however, this proposed construction is contradicted by other aspects of the patent. First, because path redundancy is the central mechanism for assuring data integrity in the '094 patent design, it follows that actual redundancy should be considered a system requirement, not merely an option. Second, the specification language quoted above expressly contemplates actual links between an NSM and at least two or more (and preferably four) RCNs. Third, Claim 36 uses the phrase "within a range" in stating its limitation that only one RCN be within a range of an NSM. If "within a range" were interpreted as requiring only a possible functioning link between an NSM and an RCN, a crucial aspect of the '094 system, as described in Claim 36, would be inoperative. Therefore, according to the well-established rule of claim construction that the same limitation appearing in different claims must be interpreted consistently, *see American Permahedge v. Barcana*, 105 F.3d 1441, 1446 (Fed.Cir.1997); *Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1579 (Fed. Cir.1995), "within a range" must be interpreted as describing an actually functioning communications link.

### 2. Comparison to the CellNet System

#### a. Literal Infringement

Based on the foregoing construction of the claim language, the court concludes that the CellNet system does not literally infringe the patent by "transmitting the multiplicity of NSM-packet signals as an RCN-packet signal." The evidence in the record clearly establishes that CellNet does not combine its TOMM packet signals at the MCC level for transmission up the communications chain. Rather, the CellNet system fragments each message generated by the TOMM to ensure more reliable communications. Further, Itron's observation that, at the MCC level, the CellNet system potentially combines consumption data generated by more than one TOMM fails to prove literal

infringement. As construed above, "NSM-packet signal" requires a full complement of NSM information elements—including message identifiers—not just the consumption data portion of it.

The court also concludes that the CellNet system does not literally infringe the '094 patent with regard to the limitation that an NSM be "within a range" of two or more RCNs. As construed above, "within a range" requires a fully functioning communication link between an NSM and at least two RCNs. A fully functioning link would mean that the RCN not only receives the packet-signal transmitted from a particular NSM but also stores the packet-signal for later transmission to the next level. *See, e.g.,* '094 Patent, Claim 39. It is via this procedure that the '094 patent achieves its system goal of path redundancy. The evidence in the record clearly establishes, however, that the CellNet system operates in a markedly different fashion. While a given transmission from any given TOMM may be heard by a number of MCCs, the TOMM information is stored only long enough to ensure that it has not been designated as the tracking MCC. Once this confirmation is received, the MCC writes over the TOMM information. As Itron's own expert acknowledged, in prohibiting the transmission of TOMM-generated data by more than one MCC, the "implementation [of the CellNet system] is different" from that of the '094 patent. Deposition of Dr. Paul T. Hulina, at 74 (CellNet Exh. E).

### b. Doctrine of Equivalents

■ Itron contends that even if the CellNet system does not literally infringe the '094 question, a fact question remains as to whether the CellNet system infringes under the doctrine of equivalents. The court does not agree. Under the doctrine of equivalents, the court engages in a three-part inquiry that asks whether an accused device "performs substantially the same overall function or work, in substantially the same way, to obtain substantially the same overall result as the claimed invention." *Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931, 934 (Fed.Cir.1987); *see also Warner–*

*Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). If so, the accused device may be considered an infringing equivalent.

■ Here, the CellNet system arguably has the same function and overall result as the '094 patent. However, "under the doctrine of equivalents, the accused device and the claimed invention cannot work in 'substantially the same way' if a limitation (including its equivalent) is missing." *LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n,* 867 F.2d 1572, 1577 (Fed.Cir.1989). By fragmenting its first-level packet signals and designating a single second-level device for data transmission up the communication chain, the CellNet system works in a significantly different way from the system embodied in the '094 patent, which teaches packet-signal combination and path redundancy. Thus, based on the evidence in the record, no reasonable jury could conclude that the CellNet system is equivalent to the '094 system with regard to the limitations in the asserted claims.

### D. Validity of the '094 Patent in Light of the DataBeam System

■ The parties also bring cross-motions on the question of the validity of the '094 patent in light of the prior art of the DataBeam system.[3] Under 35 U.S.C. § 282, a patent is presumed valid. The party challenging the validity of a patent has the burden of showing by clear and convincing evidence that the patent is invalid. *See Hewlett–Packard Co. v. Bausch & Lomb Inc.,* 909 F.2d 1464, 1467 (Fed.Cir.1990). Under 35 U.S.C. § 102, a claimed invention is anticipated if each and every element of the claimed invention is disclosed in a single prior art reference. *See In re Spada,* 911 F.2d 705, 708 (Fed.Cir.1990). Under 35 U.S.C. § 103, even if not fully anticipated, a claimed invention will be obvious, and thus invalid, if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the

---

**3.** Itron actually brings a motion pertaining to the validity of Claim 36 only. However, the court finds no reason why the arguments Itron employs in favor of Claim 36 would not apply with equal force to other challenged claims in the '094 patent.

time the invention was made to a person having ordinary skill in the art."

■ In the present case, the parties agree that, as a threshold matter, the court must construe the term "network service module." As before, the court will first endeavor to interpret this coined term in light of evidence intrinsic to the patent. Drawing from the language of Claim 36, CellNet contends that "network service module" possesses the following characteristics: (1) each NSM must be "coupled" to a physical device which generates data and (2) each NSM must include an NSM transmitter for transmitting NSM-packet signals. As Itron points out, however, CellNet's proposed construction neglects to provide a core definition of what an "network service module" actually is. For further instruction, the court must turn to the specification,[4] which summarizes the invention in this way: "The present invention . . . provides a radio communication network . . . using very low-power transmitters in conjunction with an array of remote cell nodes all operating on a single radio communication channel or frequency." Col. 18, ll. 4–10. The specification describes in detail the attributes of the "network service module," which are consistent with the goal of constructing a low-power system:

> The NSM antenna . . . support structure . . . enables the network service module 110 to be manufactured relatively cheaply as an integral device. . . . [T]he power level [of the NSM antenna] is maintained at a relatively low value on the order of 10–100 milliwatts, the energy of which can be provided by a small battery system which is relatively inexpensive.
>
> . . . .
>
> [T]he network service module can be totally self-contained within the meter housing . . . . [T]his arrangement significantly reduces the cost of the network service module to a level which is economically viable.

Col. 10, ll. 38–51; Col. 17, ll. 42–50. The specification repeatedly distinguishes prior communications networks by emphasizing the favorable size, cost, and power requirements of the NSM. These features, and their role in the inventive process behind the '094 patent, are explicitly described early in the patent:

> The anticipated high level of power used for transmitting involved very expensive battery systems or very expensive wiring.
>
> . . . .
>
> While theoretically automatic meter reading is highly desirable, it is, of course, highly price sensitive and hence it is most important for any system to be adopted that price per unit, particularly for the large number of meter reading units, be kept to a minimum. The high cost of high power transmission devices, receiving devices and battery systems generally leads to a per unit cost which is unacceptably high.

Col. 2, ll. 25–28; Col. 3, ll. 7–14. In short, the inventors of the '094 patent sought to resolve problems inherent in prior systems like DataBeam's by developing a LAN/WAN architecture—charted in Figure 1 of the patent—with the network service module acting as the foundation of a low-power system. Thus, viewed in light of the patent specification, a "network service module" is properly interpreted as a low-cost, low-power meter module.

■ Having so construed "network service module," the court concludes that no reasonable jury could find, under the clear and convincing standard, that the DataBeam reference is invalidating prior art. DataBeam teaches neither an NSM nor a LAN/WAN architecture. Further, nothing in the DataBeam system renders these features of the '094 patent obvious. As stated above, the '094 patent is as much a response to the failures of the DataBeam system as an elaboration of its strengths. And CellNet has offered no substantial evidence that an ordinary person skilled in the art would consider the NSM and LAN/WAN innovations to be obvious improvements.

---

4. CellNet's expert, Dr. Poor, agrees with this approach: "I note [that] the term 'network service module' . . . standing alone does not, in my view, have a generally understood meaning to a person of ordinary skill in the art an I therefore must look to the patent specification to interpret its meaning." Declaration of H. Vincent Poor, at 28 (Def.Exh. A).

### E. Validity of the '094 Patent in Light of the '107 Patent

 Finally, CellNet contends that the '107 patent is prior art under 35 U.S.C. § 102(e) as to the asserted claims of '094 patent. Section 102(e) defines prior art as a "patent granted on an application for patent by another filed in the United States before the invention." Under certain circumstances, however, as provided in 35 U.S.C. § 120, an application may be entitled to the effective filing date of an earlier patent. As the Federal Circuit has stated, "In order to gain the benefit of the filing date of an earlier application under 35 U.S.C. § 120, each application in the chain leading back to the earlier must comply with the written description requirement of 35 U.S.C. § 112." *Lockwood v. American Airlines, Inc.,* 107 F.3d 1565, 1571 (Fed.Cir.1997). The written description requirement is met if the description permits a person of ordinary skill in the art to recognize that "he or she was in possession of the invention." *In re Alton,* 76 F.3d 1168, 1172 (Fed.Cir.1996). Although an "applicant does not have to utilize any particular form of disclosure," all limitations must be disclosed. *Id.* "[D]rawings alone may provide a 'written description' of an invention." *Vas–Cath Inc. v. Mahurkar,* 935 F.2d 1555, 1565 (Fed.Cir.1991).

 In the present case, the '107 patent, which names Johnson and Wiebe as co-inventors, is an application for patent filed by "another" as to the '094 patent naming Johnson, Wiebe, and five other inventors. *See In re Kaplan,* 789 F.2d 1574, 1575–76 (Fed.Cir. 1986). CellNet argues that the '094 patent is not entitled to the earlier filing date because the following claim limitations appearing in the '094 patent are not supported by the '107 patent: (1) NSMs "within a range of at least one" RCN; (2) "transmitting the multiplicity of NSM-packet signals as an RCN-packet signal"; and (3) "transmitting a multiplicity of RCN-packet signals as an IDT-packet signal." The court disagrees. First, Figure 5 of the '107 patent clearly illustrates that each first-level "remote station" (which corre-

sponds to the NSM) communicates with at least one second-level "receiving station" (which corresponds to the RCN). Second, the specification of the '107 patent adequately describes the requirement in the '094 patent that an RCN transmitter means "transmit[s] the multiplicity of NSM-packet signals as an RCN-packet signal":

> Each receiving station 61, 62, 63, 64 receives, decodes and stores in memory 67 each of these date packets as received from the remote stations ....
>
> .... During the quiet time, the control unit 71 is arranged ... to transmit to the respective receiving station a poling [sic] signal calling for the receiving station to transmit the stored information from the memory 67 .... The receiving station is required ... merely to transmit the information upon request in a collated package of information which is transmitted to the central station and collected for analysis.

Col. 12, ll. 3–5, 14–19, 21–25. "A collated package" would be understood by one of ordinary skill in the art to describe "an RCN-packet signal." Third, the form and function of the IDT is fully supported by the '107 patent. As the specification states, "intermediate stations may be provided between receiving stations and the central station to provide another level of communication in the hierarchy." Col. 12, ll. 64–67. And one with ordinary skill in the art would interpret these intermediate stations to have the same structure and functionality as an RCN. For these reasons, the court concludes that the '107 patent does not invalidate the '094 patent.

### CONCLUSION

Based on the foregoing, the court concludes that (1) as a matter of law, the CellNet system does not infringe the '094 patent and (2) as a matter of law, the '094 patent is valid as against the prior art of the DataBeam system and the '107 patent.[5] Therefore, **IT IS HEREBY ORDERED** that:

---

5. In its motion papers, CellNet states that it has reserved other invalidity arguments for the time of trial. Of course, it is quite possible that the court's construction of key claim terms and its conclusion that DataBeam and the '107 patent

are not invalidating prior art will foreclose some or all of these arguments. Nonetheless, because of the possible existence of other invalidity claims, the court will not enter judgment.

1. Itron's motion for summary judgment on the issue of the infringement of Claim 36 by the CellNet system is denied.

2. Itron's motion for summary judgment on the issue of the validity of Claim 36 as against the DataBeam prior art is granted.

3. CellNet's motion for summary judgment on the issue of CellNet's non-infringement of the '094 patent is granted.

4. CellNet's motion for summary judgment on the issue of the invalidity of the '094 patent as against the DataBeam system is denied.

5. CellNet's motion for summary judgment on the issue of the invalidity of the '094 patent as against the '107 patent is denied.